today's case this morning is 5 22 0831 people versus O'Malley arguing for the appellant is Bradley Jarka arguing for the appellee is Patrick Daly. Each child will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning, counsel. Good morning, Judge. As you can see, Justice Welch is not present. He's unavailable this morning, but he will be listening to the oral arguments recording and participating in in our decision. Uh, appellant, if you are ready to proceed, you may do so. Thank you, Your Honor. Good morning, counsel. May it please the court. My name is Brad Jarka from the office of the state appellate defender, and I represent the defendant appellant, Robert O'Malley, who I believe is before the court this morning. As this case reaches this court, the parties agree that, at a minimum, it must be remanded for the trial court to determine Mr. O'Malley's ability to pay restitution and set a manner of payment. So this morning, I plan to focus on why even that step is not required, because this court should reverse the restitution order outright for two reasons. First, the trial court erroneously concluded that Mrs. Shue's accrual of $50,000 in attorney fees for the administration of Mr. Shue's estate was an out-of-pocket expense where Mr. O'Malley's insurance had already tendered in full $499,500. Second, Mr. O'Malley's failure to report the accident did not proximately cause the accrual of attorney fees for administering Mr. Shue's estate. In construing the phrase out-of-pocket expense in Section 5-5-6, this court's analysis is governed by People v. Roop, which held that a $100,000 insurance settlement from the defendant barred the enforcement of a restitution order of approximately $15,000 based on funeral expenses related to a death caused by a car accident. And Roop discussed previous decisions in People v. Abraham and People v. Wilson, which had interpreted the out-of-pocket expense language in 5-5-6 and concluded that the collateral source rule would allow the trial court to impose restitution where either the victim's insurance or another third party had reimbursed them. But Roop distinguished both Abraham and Wilson where a defendant or his insurance company had already reimbursed the victim. In that context, the collateral source rule would not apply and the expenses are no longer out-of-pocket. The same result is warranted here. The trial court received undisputed evidence that $499,500 from Mr. O'Malley's insurance had been, quote, tendered in full, unquote. And the trial court agreed in its findings at the motion to reconsider sentence that there was compensation from insurance. But under Roop, the trial court erred in concluding that the insurance payment did not compensate Mrs. Shue for the $50,000 in fees from Piefman. Now, the state does not cite Roop, the state does not attempt to distinguish Roop, and the state does not argue that Roop is wrongly decided. Instead, it offers two broad lines of argument that this court should reject. The state's first line of argument relies on various decisions related to wrongful death and Survival Act claims to argue that any use of insurance for Piefman's fees would reduce the overall civil recovery and therefore would not satisfy the restitution statute's remedial purpose of making victims whole. First, why wouldn't that apply in this case? So two reasons, Your Honor. I think the first and most obvious reason is that that reasoning runs headlong into Roop itself, which barred restitution where the defendant's insurance has compensated the victim. And the second reason is that the state's concern, the state's broad conception of financial wholeness is untethered from the text of Section 5-5-6. So the statute already tells us what it means for a victim to be financially whole in the context of restitution, and it means compensation for the actual out-of-pocket expenses caused by the criminal conduct. So applying Roop and allowing Mr. O'Malley's insurance to compensate Mrs. Hsu for Piefman's fees, which is the only financial loss alleged in the criminal case, satisfies that purpose. Those fees though are for the opening of a state and the administration of an estate and has nothing to do with the loss incurred as a result of the death. So those are separate fees that nobody has said are part of the wrongful death resolution. That's correct, Your Honor. I would point the court to the record though, which does not support the idea that any argument about cross purposes between the wrongful death settlement and the availability of funds for satisfying the fees from Piefman would somehow defeat the applicability of the insurance payment for that purpose. So when the state argued at sentencing, it made only two comments about the insurance payment. The first was to note that the settlement was not yet final, and the second was at the end of its argument to encourage the court to impose the $50,000 in restitution. So to the extent that the state's position was that something about the nature of the settlement or the nature of the insurance payment would not be compensatory for the fees because the fees and the wrongful death settlement were at some kind of cross-purpose, Mr. O'Malley was never given the opportunity to respond to that. And more importantly, the trial court accepted the $499,500 amount as just a straight-up insurance payment. The court made no findings that were related to the nature of the payment. The court made no findings that restitution remained proper because of the nature of the payment. So Roop's analysis does not require that type of parsing of the insurance settlement vis-a-vis the fees that are accrued and are claimed to be available as restitution. The record indicates that the $50,000 was for the administration of the estate and that they thought that money up to $50,000 would be due in owing, correct? That's correct, Your Honor. And then they did parse out how much money was payable individually versus to the estate. Is that true? That is true. Out of the $400,000? $400,000. Yes, that's correct, Your Honor. So $250,000 was going to be available to Mrs. Hsu personally and $249,500 to Mrs. Hsu personally, $250,000 to Mrs. Hsu as the executor. We don't know when you say it was payable to her as the executor, we don't know how that was to be distributed. That had to be done through the estate process. That's correct, and the state does make a point about the fact that Piefman would not become an estate creditor. My understanding of the Probate Act, though, is that Mrs. Hsu would have had authority as the independent executor to hire Piefman to administer the estate and use estate funds to do so. And I am not aware of any law, and I don't believe the state has cited any, that suggests that the funds paid to Mrs. Hsu as the independent executor would either not be available to her to reimburse the estate if the estate paid those funds or to reimburse her personally if she had paid the funds that were used to administer the estate. But the insurance money was to make the entire group, whether it was through the Survival Act or the Harmful Death Act, whole and not to pay administrative expenses. Therefore, the restitution statute can be used to do that, correct? Not under ROOP. Again, ROOP's analysis did not purport to parse out the purpose of the insurance settlement. Was that raised in ROOP? It wasn't raised in ROOP, and it wasn't raised below. The state did itemize the $50,000 bill, but it made no argument to the trial court, excuse me, that the wrongful death settlement, which allows for the recovery of a pecuniary loss per the state's own cases, or why the money that would be available to Mrs. Hsu as the administrator of the estate would not be available to compensate the $50,000 fees either as an expense that was paid by the estate or as an expense that Mrs. Hsu paid personally. And I think one of the... You concede that the court had the authority under the facts of this case to impose restitution at all? I do, Your Honor. So under the first provision of the statute, the court had authority to impose restitution for this offense generally. But the following provisions of the statute still require, when the court is sort of calculating that restitution, to consider whether or not it remains an out-of-pocket expense. So the argument here is just about the meaning of that statutory language, what it means to be an out-of-pocket expense. And like I said, I agree that the state itemized the fees that Piefman said were due and owing, but the state never made any argument in the trial court, and the trial court never made any findings that the insurance payment would somehow be unavailable to Mrs. Hsu, either in her personal capacity or as the executor, to reimburse those fees. So our position is that... I'm not saying unavailable as much as I'm saying insufficient. Yes, I understood, Your Honor. So I think that gets to the state's broader point, which is that somehow the comprehensive financial wholeness that Mrs. Hsu was able to seek in the civil case is reduced if some of those funds have to be used to pay Piefman's fees. And I think that sort of comprehensive view of financial wholeness is simply untethered from the text of 5-5-6. The restitution statute thinks of financial wholeness in a very specific way, based on the text of the statute. And to the extent the parties thought that using the insurance payment for the $50,000 attorney fees would somehow reduce the overall recovery in the civil case, that was a question to be answered in the But in this case, the only relevant question is the meaning of out-of-pocket expense, and Rupp provides a straightforward answer to that question. What would have happened in this case had the estate delayed taking the check of $500,000 approximately and allowed sentencing to proceed where restitution was awarded, and then they settled the civil case? Does the restitution award go back? My understanding under the restitution statute is no. The text of the restitution statute does not bar civil recovery. But the question, as far as... So this is a matter of timing? I'm not sure it's necessarily a matter of timing. It's just a matter of what the funds were available for. And the funds here had been tendered in full. Again, neither the state nor the trial court made any argument or findings that the funds would not be usable for the reimbursement of Piefman's fees. Well, but I'm saying that had the case settled after sentencing and after the $50,000 had been imposed, the parties could have settled the case for the same amount of money and the restitution award would have been the same. It wouldn't have been paid back out of the third-party beneficiary, the state, or the insurance proceeds. You see what I'm saying? I do see what you're saying, Your Honor. I'm just not sure how that theory squares with ROOP. I mean, in ROOP, the funeral expenses had already been paid and then the insurance money was paid. And the court held that the insurance money barred the restitution. And I think it does make sense that if the restitution order is imposed first before there is a payment, then there is an out-of-pocket expense that has been paid. But if the defendant has factually compensated the victim, then the expense no longer is out of pocket. So I don't think the court necessarily has to be concerned about the idea that timing might matter. Because the question is whether the victim has been compensated in a way that can be used to pay the expenses that are claimed in restitution. And I think— All right. And let me make sure I understand what your view of the state's concession is on remand. What do you believe should be done on remand? On remand, per Section 5-5-6F, I believe, the trial court is to consider Mr. O'Malley's ability to pay as it relates to setting the type of payment and the schedule of payment. So his ability to pay in terms of whether the payment has to be done in installments or as a lump sum. Those types of payment options are available to the trial court, I believe, under the statute. And you're asking that the $50,000 imposed be vacated? Correct. Okay. All right. Thank you. Thank you. All right. Appley, you may proceed. Thank you, Your Honor. Good morning, Your Honor's counsel. My name is Patrick Daly. I'm with the Office of the State's Attorney's Appellate Prosecutor on behalf of the state. With regards to the concession, first of all, I think I would agree that if the court agrees with the defendant's argument regarding whether the restitution needs to be vacated, that would move to concession because there would be no restitution for the court to consider payment for for ability to pay or time in which it is to be paid. The state has raised forfeiture arguments. The defendant has answered those arguments. I'm not going to really discuss those now. I just rely on my brief on those. And I want to focus on the specific issues with regards to the payment of the restitution or the order of restitution. Defendant's argument is generally correct in the broad sense that courts will not allow for restitution where there's a double recovery. The case law that defendants cite, such as ROOP, I think are framed factually within contexts where there is a direct correlation between the compensatory nature of defendant's insurance and what the call the victim recovers as a result of that. And you can't basically get that back in restitution as well if the insurer or the defendant had already paid that out. I think that what makes this case somewhat unique, though, and perhaps a little bit more complex than defendant's argument would suggest is whether there is, in fact, a double recovery here. And I think that that comes down to the fact that the we sort of well, let me start by saying this, because I do want to make sure we get this get this clear, because from defendant's argument this morning, I'm getting a sense of kind of an inversion of the burden here. The state did come forward at the time of sentencing, provided a detailed letter explaining expenses that had already been incurred and were likely to going to be incurred in the future with regards to the settlement and legal and financial matters with regards to the state being handled by a separate law firm from the civil suit. It was anticipated those would be in excess of $50,000. And so the state asked for it and defendant was ordered to pay $50,000. The only thing the defense counsel came forward with in response to that was an email from a law firm looking at it, presumably it's probably the insurance firm, detailing a non-finalized settlement of $250,000 to Mississue, $249,500, I think, or $250,000, I don't remember, to the estate and then $500 to the daughter. The purpose of the discussion that the state has with regards to the civil rules here is, I think, it kind of comes down to focusing on and analyzing the nature of the attorney's fees and how they work within the broader context of the civil settlement, if you will. Starting really, I think, with the general civil premise of what I guess is called typically the American rule. Plaintiffs at suit are expected to pay their own legal fees. And this is why there's a discussion in the state's brief about the Attorney's Lien Act, that when there is a civil judgment, then the attorney's fees that are to be recovered from that are really part of the judgment itself. And so what we have in this instance where the civil litigation, which is inclusive of the three-part settlement, which I discussed a second ago, would be tendered minus whatever attorney's fees are going to be required to be paid out as part of that judgment. And so that's the only attorney's fees in which there's a direct line between the judgment, excuse me, the settlement and the disbursement to the, we'll call it the settlement. Once we understand that, then we have to look at what this judgment appears to be. When I say appears to be, getting back to what the defendant came forward with at the sentencing hearing, we don't really know the details of this judgment, okay? The state presented its side of the equation about what expenses that Mrs. Hsu or Mrs. Hsu's estate has incurred. The defendants only came forward, I guess, in response to that by saying, well, she's been compensated, I guess, without any real details. We don't know for sure whether that settlement went through. It requires court approval for it to go through. Right. We don't know any of the details of that yet. Right, right. And so, I mean, I think within the panoply of options for this court, if it doesn't affirm the most favorable disposition, would be a remand for some clarification in that regard, whether that judgment's gone through. And I think it's important here because without the details of that, we don't know, nor can we presume, Your Honor, whether there is this, as defendant states in their opening brief, a direct line between the civil, excuse me, the payment to the estate and the compensation of the estate expenses. And that's where it becomes important at this point to understand what this settlement likely means. So, the $500 paid to the daughter, again, there's a veneer of speculation of this, but I think that we can understand how this is structured, that the $500 of the daughter who was injured in the accident was likely for her injuries. $250,000 paid to Mrs. Hsu is likely a wrongful death, and then payment made to the estate is likely a survival action. And the distinction between those two is, as court's aware, that the wrongful death compensates Mrs. Hsu for post-mortem, if you will, pecuniary damages, if you will, including loss of consortium, pain and suffering, mental anguish, things like that. The survival act- Mr. Daley, I think you've actually got it reversed. I think the payment to Mrs. Hsu would be for the survival action, and the payment to the estate is for the wrongful death. But go ahead, I understand. And perhaps, maybe I misunderstand. In any event, I think the court understands that there is a distinction here with the wrongful death and the survival act with regards to what is being compensated. But we don't know that under the, and it's my understanding that survival acts are actions brought, or it's a derivative action brought on behalf of the decedent by the estate, which is what I would assume the payment of the $250,000 as part of the settlement would be in response to a survival action. So that being the case, we know that wrongful death suits are not subject to attachment by creditors, but survival act assets, which are part of the estate, are. Okay. The Plythven Law Firm here is, contrary to what not a creditor, they are in fact a creditor because they are handling the estate and they're incurring expenses as a result of the handling of that estate. The amount of $50,000 are soon to be $50,000. So once- But all of this is, all of what you're arguing here is conjecture. We don't know from the record. I'm afraid so, Judge, but the conjecture is, the conjecture, the gap in the record resides with the defendant in this regard, not the state. We've presented our restitution amount. The defendant is going to argue that there should be an offset, that there is an offset, that there's a civil judgment that specifically encompasses these things, that somehow that the Plythven's firms are not to be considered part of a creditor, which is going to derive or extract money from the assets of the estate, which is what the civil judgment will go into, and thus resulting in a net $50,000 loss either directly to Mrs. Schuh or to defendant at the time. The defendant did not do so. And so, like I said, I think that the court's got two options here. If it doesn't feel comfortable without that knowledge, certainly a remand for clarification in that regard may be appropriate. But I do think in that sense as well, and I have to say as an advocate that my alternative argument is that the defendant had ample opportunity to present this evidence and failed to do so. So what we're left with is a record which we can, I think, at least glean inferentially information about the settlement context. If your honors certainly understand that when an estate action is being settled, it's almost invariably likely it's part of a survival act. Then knowing what the purposes of the survival act action and the fact that the $50,000 is essentially a debt against the estate, that's out-of-pocket money for the victim in this case. It certainly is. It's not part of civil judgment. It just isn't. It's a separate and distinct debt incurred that would not have been incurred, it would not have been paid, but for the crime in this case. So I'm about out of time, so I'm not going to have enough to get into a lot of the other details here, but we would rest on our brief in regards to all other issues in this case. If the court has any other questions, however, I'd be happy to answer them at this time. Justice Gates, any further questions? Nothing further. Thank you, Mr. Daly. Thank you, counsel. Revato? Thank you, your honors. I will just make one main point about what the state calls the veneer of speculation that is hanging over the issue in this case. I would make two points. The first is that the email tendered by defense counsel at sentencing related to the insurance payment indicates that the insurance payment had already been tendered in full, even though the settlement had not yet been finalized. The state did not dispute that fact at sentencing, and the trial court, I think it's really important to emphasize, both at sentencing and at the motion to reconsider sentence accepted the existence of the $499,500 as compensation to the victim, but the trial court's legal error was not following group and not applying that insurance payment to the claimed expenses that the state was asking for in restitution. Mr. Jarka, had the normal routine been followed in a civil suit, there would be a court order approving the settlement, especially where there's a minor involved. None of that was put before the court, and that court order would have potentially shown whether fees for an attorney were being held back or awarded. We don't have any of that in the record before us. That's correct, Your Honor, and again, I agree with the state to an extent that if an objection to applying the insurance payment had been made on that basis, defense counsel would have borne the burden of production to respond to that, but the state accepted the $499,500 as having been in full without any objection. Whose burden was this to bring the record before the court and make it clear? Under People v. Burge, the state had the burden to prove the amount of restitution that it was claiming. I agree with the state that there was then a burden shift to Mr. O'Malley to provide the amount that would be available as a set off, but because the trial court accepted that amount without question, there was no reason to probe further, just as the court and group did not probe any further, into the nature of that financial payment and what it was specifically going to be directed to in the civil case. I would point the court specifically to page 261 of the report of proceedings, which is the hearing on the motion to reconsider sentence, where the trial court walks through the reasons it's rejecting the insurance payment as an offset for the $50,000, and the only reason the trial court gave, and again, the state offered no objection at all, the only reason the trial court gave for not applying the insurance payment was that it didn't think the compensation was sufficient. It didn't tie the rejection of Mr. O'Malley's argument to a lack of information or a lack of facts based on the existence of the $499,500 insurance settlement. So, like Mr. Daley, I do plan to rest on the briefs because I have two brief points to make that are less directly related to what we've been discussing this morning. The first relates to Issue 3 in the Illinois Supreme Court's recent decision in People v. Johnson, which rejected second-pronged plain error for improper sentencing factors. So, we would withdraw the second-pronged plain error argument only as to Issue 3 and rest on the opening and reply briefs for the reasons that both the overall sentencing evidence and the evidence of the improper factor were both balanced under first-pronged plain error. The second thing that I would be remiss not to mention is that in the event this court agrees with the third issue, the improper factor argument, Mr. O'Malley does respectfully request prompt resolution of this case. At the time that Mr. O'Malley objected to the state's 511-day period for drafting its brief, he was set to be released on MSR in June of 2026. He is now in a work-release program and is set to on MSR on November 26th of this year. So, without a prompt resolution of this appeal to the extent this court agrees with Issue 3 as to the improper sentencing factor and will require a remand for resentencing, there is now a risk that that relief may become ineffectual. So, for the reasons that we've discussed in the briefs, unless the court has further questions, I'm happy to rest on the briefs for the remainder of my arguments. You were very quick. What is the date of his release? November 26th? November 26th of this year, that's correct, Your Honor, on MSR. And then he'll have one year of MSR, I believe, to serve after that. But theoretically, his restitution would start on November 26th? That's correct. Okay. As far as I'm aware, I think that's how it would work. And so, if the court has no questions for the reasons discussed in the briefs and this morning, we ask that this court vacate the restitution outright and vacate the improper sentence and remand for resentencing, or alternatively, as the parties agree, remand for the trial court to consider Mr. O'Malley's ability to pay and set the manner of payment. Any further questions, Justice Cates? No, thank you. All right. Thank you, Counsel, for your arguments. We will take this matter under advisement and issue a ruling in due course. Thank you.